# In the United States Court of Federal Claims

No. 10-638L
(Filed:  May 27, 2014)

|  |  |  |
|---|---|---|
| GRIFFIN & GRIFFIN EXPLORATION, LLC, ROBERT L. SMITH, and ROBERT L. SMITH & ASSOCIATES, INC., | ) ) ) ) | Subject Matter Jurisdiction; 28 U.S.C. 1491(a)(1); Motion to Dismiss; RCFC 12(b)(1); Failure to State Claim; |
| Plaintiffs, | ) ) ) | RCFC 12(b)(6); Breach  of Contract; Federal Oil and Gas |
| v. | ) ) ) | Lease; RCFC 56; Summary Judgment; Interior Board of Land |
| THE UNITED STATES OF AMERICA, | ) ) ) | Appeals (IBLA); Bureau of Land Management; Lease |
| Defendant. | ) ) ) ) | Cancellation; 43 C.F.R. § 3.108.3(d). |

*Jesse Mitchell, III*, The Mitchell Firm, PLLC, Ridgeland, MS, for Griffin & Griffin Exploration, LLC, Robert L. Smith, and Robert L. Smith & Associates, Inc.

*David Frank D'Alessandris*, Civil Division, United States Department of Justice, Washington DC, for defendant.

## OPINION AND ORDER

**KAPLAN, Judge.**

This case is before the Court on plaintiffs' motion for summary judgment as to liability pursuant to Rules of the Court of Federal Claims ("RCFC") 56(a).  Also before the Court is defendant's motion to dismiss pursuant to RCFC 12(b)(1) and 12(b)(6), or cross motion for summary judgment on liability.  The defendant has also moved, in the alternative, for partial summary judgment on the proper measure of damages.

Plaintiffs in this case are Griffin & Griffin Exploration, LLC, Robert L. Smith & Associates, Inc., both Mississippi Corporations, and Robert L. Smith, a Mississippi resident (hereinafter collectively "Plaintiffs" or "Griffin").  The defendant is the United States of America (hereinafter "the government") acting through the Bureau of Land Management ("BLM").  Plaintiffs seek damages arising out of the government's alleged breach of contract involving two oil and gas leases, MSES 54127 and MSES 54583 ("Griffin leases"), issued by BLM for 160 acres of the Homochitto National Forest.  BLM determined that the Griffin leases were improperly issued because of the existence of a prior valid lease to Bayou Petroleum Company ("Bayou lease") for the same property.  Consequently, BLM canceled the Griffin leases pursuant to 43 C.F.R. § 3108.3(d) (2013).  On September 14, 2011, the Interior Board of Land Appeals

("IBLA" or "Board") affirmed BLM's decision.  Robert L. Smith, IBLA 2008-269 & 2009-12, at 19, in Def.'s App. Tab 12 at 62 ("Board Order").  The IBLA held that the Griffin leases were void ab initio because the leasehold interest they purported to convey was already encumbered by Bayou's outstanding valid lease.  Thus, "BLM did not have the leasehold interest in those lands to lease."  Board Order at 14.  Plaintiffs seek over $30 million in damages, exclusive of interest, costs, and attorney's fees for their recoverable expenses, loss of property, loss of income, and loss of the productive value of the minerals and gas.

Plaintiffs argue that under the terms of the oil and gas leases they entered into with the government they were entitled to the exclusive right to drill for, mine, extract, remove, and dispose of all of the oil and gas in the leased lands for a period of ten years (subject to a right of renewal).  In Count I of their complaint, Griffin contends that the government's cancellation of their leases was a breach of contract.[1]

The government, on the other hand, argues that the complaint must be dismissed either on jurisdictional grounds under RCFC 12(b)(1) or for failure to state a claim under RCFC 12(b)(6), or that summary judgment should be entered in its favor because the Court lacks the authority to review or overturn the IBLA's holding that the leases were void ab initio.  In the alternative, the government moves for partial summary judgment regarding the proper measure of damages.  At best, the government argues, plaintiffs are entitled to recovery on a quasi-contractual theory, limiting the measure of recoverable damages to restitution.

The Court treats the defendant's motion to dismiss for failure to state a claim as a motion for summary judgment pursuant to RCFC 12(d), which states that "[i]f . . . matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment."  See Rotec Indus., Inc. v. Mitsubishi Corp., 215 F.3d 1246, 1250 (Fed. Cir. 2000).  For the reasons set forth below, the Court (1) **DENIES** the government's motion to dismiss under RCFC 12(b)(1) because it finds that it has subject matter jurisdiction over plaintiffs' claim, (2) **GRANTS in part** and **DENIES in part** plaintiffs' motion for summary judgment as to liability for breach of contract, (3) **GRANTS in part** and **DENIES in part** the government's motion for summary judgment as to liability for breach of contract, and (4) **DENIES** the government's motion for partial summary judgment on the proper measure of damages.

---

[1] Griffin previously included a second count in their complaint alleging that the government's actions constituted a taking of their property without just compensation in violation of the Fifth Amendment.  At the oral argument, however, plaintiffs conceded that this claim lacked merit and agreed to withdraw it.  Oral Arg. Tr. 15-16.  The parties subsequently filed a joint stipulation of claim dismissal pursuant to RCFC 41(a)(1)(A)(ii).  Joint Stipulation of Claim Dismissal, ECF No. 51.

# BACKGROUND[2]

## I.   BLM Oil and Gas Leasing

BLM leases oil and gas in public domain lands pursuant to the Mineral Leasing Act of 1920, 30 U.S.C. §§ 181-263, and in acquired lands pursuant to the Mineral Leasing Act for Acquired Lands of 1947, 30 U.S.C. §§ 351-360.  The Eastern States Office issues oil and gas leases for federal lands in the eastern United States, including federally-owned oil and gas in the Homochitto National Forest in Mississippi.  Def.'s Opp'n 5, ECF No. 39.  BLM issues oil and gas leases in acquired lands in National Forests only with the concurrence of the United States Forest Service.  30 U.S.C. § 352.  Lessees receive permits to drill on those lands only after the Forest Service approves the operator's surface use plan of operations.  36 C.F.R. § 228.105(a)(1); Onshore Oil and Gas Order No. 1, para. III.E.2.b.1, 72 Fed. Reg. 10,308, 10,334 (U.S.D.A., Mar. 7, 2007) (final rule).  After issuance of an oil and gas lease by BLM, the Minerals Management Service ("MMS") is responsible for mineral revenue functions on all federal lands including collecting rental payments, royalties on production of oil or gas, and maintaining accounting records.  Def.'s Opp'n 5-6.[3]

## II.  The Bayou Lease

In 1997, BLM leased 160 acres of acquired land in the Homochitto National Forest in Mississippi under lease MSES 49204 ("Bayou lease") to Bayou Petroleum Company.  Board Order at 2; see also Bayou Exploration, LLC, 2012 WL 721799, at *1 (IBLA 2012), ("Bayou Order").  The lease was effective December 1, 1997, for a primary term of ten years, and so long thereafter as oil or gas was produced in paying quantities.  Bayou Order at *1.  BLM subsequently approved an assignment of the lease from Bayou Petroleum Company to Bayou Exploration, LLC on October 31, 2000, effective August 1, 1999.  Id.

The Bayou lease required annual rental payments of $1.50 per acre ($240) for the first five years, and $2.00 per acre ($320) thereafter.  Board Order at 3.  In September 2002, MMS sent Bayou a notice for annual rental of $240 for the lease year beginning December 1, 2002.  Id.  However, the rental amount stated in the notice was erroneous.  Id.  The lease year beginning December 1, 2002 was the sixth year of the lease, and therefore the correct amount due was $320, not $240.  Id.  In response to the notice, Bayou timely paid the requested $240.  Id. at 3-4.

In April 2003, Bayou sent MMS a check in the amount of $300, but did not specify how the payment was to be allocated among Bayou's several oil and gas leases.  Id. at 3.  In September 2003, MMS sent a notice of rental payments due in the amount of $320 for the Bayou lease for the lease year beginning December 1, 2003.  Id. at 4.  That notice did not mention the

---

[2] The facts are taken from the parties' pleadings and supporting exhibits.  Unless otherwise noted, the facts recited herein are undisputed.

[3] Since the time of the actions complained of in this case, the Department of the Interior has divided MMS into three bureaus.  Def.'s Opp'n 6.  The Office of Natural Resource Revenue (ONRR) now collects rental and royalty payments.  Id.

deficiency in the rental payment for the December 1, 2002 lease year or the allocation of the April 2003 payment. Id. Bayou timely paid the requested $320. Id.

In March 2004, MMS transmitted to BLM's Eastern States Office a report that listed the Bayou lease as terminated[4] by operation of law because Bayou failed to pay the full $320 due on December 1, 2002. Id. at 4. Based on this report, BLM considered Bayou's lease terminated. Id. BLM did not notify Bayou of its conclusion. Id.

In November 2004, Bayou paid MMS $400 but did not include instructions on how the payment should be credited among Bayou's three lease accounts or for which lease year. Id. Around December 2004, MMS corrected its records to show that Bayou's lease had not terminated. Id. MMS, however, did not notify BLM of the correction. Id. On December 10, 2004, MMS sent Bayou its first notice of the existence of a deficiency, stating that Bayou owed $80 for each of the rental years beginning December 1, 2002 and December 1, 2004. Id. Bayou timely submitted the requested payments ($160). Id. In addition, Bayou also timely paid the full $320 due for the Bayou lease for each of the lease years beginning December 1, 2005 and December 1, 2006. Id. at 5 n.14.

On January 21, 2005, MMS notified BLM by email that it would be "unterminating" the Bayou lease because the past due payment on the lease had been received. Id. at 4. Yet again, there was a failure of communication. This time, the email notifying BLM that the Bayou lease was still valid was not received either because of computer connectivity problems or because an employee failed to enter the information into the lease file. Def.'s Opp'n 7. In either event, BLM's lease file continued to show the Bayou lease as terminated for failure to make rental payments. Board Order at 4.

## III. The Griffin Leases

### A. BLM issues leases MSES 54127 and MSES 54583 to plaintiffs.

In or around November 2005, Robert L. Smith sent BLM an expression of interest to lease the lands that were, unbeknownst to Smith, still subject to the Bayou lease. Decl. of Kemba Anderson-Artis ¶ 12, Def.'s App. 3 ("Anderson Decl."); Aff. of Robert L. Smith ¶¶ 2-5, Pl.'s Mot. Summ J. Ex. L ("Smith Aff."). BLM indicated that the 160 acres were available for lease because the Bayou lease had terminated automatically for failure to make rental payments. Anderson Decl. ¶ 11. BLM divided the 160-acre parcel under the Bayou lease into two tracts of approximately eighty acres and offered them at separate public auctions. Id. ¶ 12. Robert L. Smith and his company Robert L. Smith & Associates, Inc. (collectively "Smith") were the highest bidders on both oil and gas leases. Board Order at 5. Smith was issued lease MSES 54127, effective August 1, 2006, and lease MSES 54583, effective March 1, 2007 (collectively "Griffin leases"). Id. The leases had a primary term of ten years, with the right to extend the

---

[4] Oil Res., Inc., 28 IBLA 394, 405 ("The 'cancellation' and 'termination' of oil and gas leases are separate, distinct concepts. Cancellation requires a specific act by the Department authorized by various statutes. Termination under 30 U.S.C. § 188(B) (1970) is automatic, occurring by operation of law when the lessee fails to pay his rental timely.")

term of each lease for as long as the subject area produced oil or gas in paying quantities.  Id.; Lease MSES 54127, Pl.'s Mot. Summ. J. Ex. A; Lease MSES 54583, Pl.'s Mot. Summ. J. Ex. B; see also 43 C.F.R. § 3.107.2-1

Smith subsequently assigned their leasehold rights and obligations to Griffin & Griffin Exploration, LLC.  Board Order at 5.  In March 2008, Smith submitted to BLM a notice of transfer of the record title of the two leases to Griffin & Griffin Exploration, LLC.[5]  Id.

### B.  Plaintiffs' performance under the Griffin leases.

Griffin obtained the necessary approvals to begin work from the Mississippi Oil and Gas Board, United States Forest Service, and BLM.  Pl. Mot. Summ. J. ¶ 5; Smith Aff. ¶¶ 7-8. Griffin began drilling a well (USA 1-37 No.1) on lease MSES 54583 in May 2007.  Board Order at 5; Bayou Order at *2.  Meanwhile, MMS sent another email to BLM advising it that the Bayou lease had not terminated and that all payments were received on time.  Board Order at 6. On or around June 1, 2007, Bayou discovered Griffin's operations on its lease and contacted BLM, prompting both BLM and MMS to review their lease records.  Board Order at 6 n.17. Bayou requested an indefinite suspension of operations on its lease on October 5, 2007, pending resolution of the conflicting leases to Griffin.  Board Order at 6.[6]  Meanwhile, Griffin continued drilling its well.

Griffin completed the well on October 23, 2007, striking natural gas.  Bayou Order at *2. Following completion of the well, Griffin constructed a pipeline to transport natural gas from the well and began producing natural gas in or around November 2007.  Board Order at 5.  But see MS Oil & Gas Board Well Production in Def.'s App. Tab 9 at 1 ("Well Production") (noting natural gas production in October 2007).  According to the Mississippi Oil and Gas Board records, production from Griffin's well peaked in January 2008, at 4,466 thousand cubic feet (mcf) of natural gas, and then declined.  Well Production at 1.  On August 27, 2008, BLM ordered that the well be shut-in on October 1, 2008 as part of its decision to cancel the Griffin leases.  BLM Decision, dated August 27, 2008, at 1, Pl.'s Mot. Summ J. Ex. D ("BLM Decision").  The well last produced 630 mcf in January 2009.  Well Production at 1; Bayou Order at *2 n.6.  During its life, the well produced a total of 49,701 mcf of gas.  Well Production at 1.

### C.  BLM cancels the Griffin leases.

---

[5] The parties dispute whether or not BLM recognized the notices of assignment.  Pl.'s Mot. Summ. J. ¶ 5; Def.'s Opp'n 3-4; Board Order at 5.  According to the government, because BLM was then aware of the controversy over the validity of the Griffin leases, BLM did not approve the transfers.  Anderson Decl. ¶ 16.  This dispute is not a material one for purposes of the disposition of the motions before the Court.

[6] It is unclear from the record what information BLM conveyed to plaintiffs about the leases during this period of time.  See Anderson Decl. ¶ 14 ("There were several communications with Griffin and Bayou about the legal status of the leases.").

Months after the well was completed and producing gas in paying quantities, Kenneth M. LaGraize, Manager of Bayou Exploration, LLC, advised plaintiffs that Bayou Exploration had the exclusive rights to explore and drill in the subject area pursuant to the Bayou lease.[7]  Smith Aff. ¶ 12; Pl.'s Mot. Summ J. ¶ 6.  BLM nonetheless repeatedly assured plaintiffs that Bayou's lease had terminated and that Griffin had the exclusive right to explore and drill in the area.  Consequently, Griffin continued producing gas from the well and making royalty payments to the government as required by its lease.  Smith Aff. ¶¶ 13-14.

On August 27, 2008, BLM issued a decision, effective September 1, 2008, in which it canceled the Griffin leases, concluding that they were improperly issued within the meaning of 43 C.F.R. 3108.3(d) because the lands subject to the Griffin leases were already subject to a valid lease to Bayou.  BLM Decision at 1.  BLM notified Smith that the well would be shut-in on October 1, 2008 unless plaintiffs reached an agreement with Bayou Exploration, LLC.  BLM Decision at 1; Board Order at 7.  In addition, BLM offered to refund to Smith their bonus bid, rental payments, and administrative fees for the two leases.  Board Order at 7.

Plaintiffs timely appealed BLM's decision to the IBLA pursuant to 43 C.F.R. § 4.410(a) and filed an unopposed petition for a stay of the decision pending the Board's review.  Id.  The Board granted the stay on January 22, 2009 and encouraged plaintiffs and Bayou to reach a settlement.  Id. at 2.  In the meantime, plaintiffs filed their breach of contract and takings claims in this Court on September 23, 2010.  Griffin & Griffin Exploration, LLC v. United States, No. 10-638L (filed September 23, 2010).  The Court stayed proceedings in the case on March 3, 2011 pending a decision by the Board.  Id., ECF No. 14.

Unable to reach a settlement, plaintiffs and Bayou returned to the IBLA to resolve their appeals.  Board Order at 2.  Before the Board, plaintiffs argued that Bayou's lease had terminated at the time the Griffin leases were issued and that the Griffin leases were, therefore, valid.  Board Order at 9.  In the alternative, plaintiffs urged the Board to find their lease valid based on equitable considerations.  Id.  BLM argued, on the other hand, that Bayou's lease had not terminated at the time the Griffin leases were issued, and thus the Griffin leases were not valid.  Board Order at 10.

On September 14, 2011, the Board issued its decision finding that the Bayou lease was in good standing at the time the Griffin leases were issued.  The Board noted that lands already leased cannot be leased again.  "The lands offered for lease sale in 2006 and embraced in leases MSES 54127 and MSES 54583, issued to Smith, were within outstanding oil and gas lease MSES 49204; thus BLM did not have the leasehold interest in those lands to lease, and leases MSES 54127 and MSES 54583 were void ab initio."  Board Order at 14.  The Board reasoned that "lands included in an outstanding oil and gas lease are not available for oil and gas leasing and a lease issued for such lands is void."  Board Order at 14 (quoting Walter S. Fees, Jr., 110 IBLA 377, 380 (1989).  Thus, "[plaintiffs] gained no rights under [the subsequently issued lease] so long as the prior lease was in existence."  Id.

---

[7] The date of this communication is not stated in the record.

Based on these findings, the Board held that the Griffin leases were properly canceled pursuant to 43 C.F.R. § 3108.3(d) which provides that "[l]eases shall be subject to cancellation[8] if improperly issued." Board Order at 14. The Board noted that "BLM had no authority to convey to Smith a leasehold interest held by Bayou." Id.

Smith and Griffin did not seek review of the Board's order in federal district court pursuant to the Administrative Procedure Act, 5 U.S.C. § 702. See Bayou Order at *3 n.12; Def.'s Opp'n 9. Following the Board's decision on the validity of the Griffin leases, plaintiffs amended their complaint in this Court, and the parties filed the motions currently before the Court for resolution. The Court held oral argument on Tuesday, May 6, 2014. Oral Arg. Tr., ECF No. 50.

## DISCUSSION

## I.   The Court Has Jurisdiction over Plaintiffs' Breach of Contract Claim.

The Court of Federal Claims has jurisdiction under the Tucker Act to hear "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2006). The Tucker Act waives the sovereign immunity of the United States to allow a suit for money damages, United States v. Mitchell, 463 U.S. 206, 212 (1983), but it does not confer any substantive rights on a plaintiff. United States v. Testan, 424 U.S. 392, 398 (1976). Therefore, a plaintiff seeking to invoke the court's Tucker Act jurisdiction must identify an independent source of a substantive right to money damages from the United States arising out of a contract, statute, regulation, or constitutional provision. Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1306 (Fed. Cir. 2008).

Subject matter jurisdiction is a threshold matter, and the court must dismiss the case if it does not have jurisdiction. Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006); Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998). In deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all undisputed facts in the pleadings and draws all reasonable inferences in favor of the plaintiff. Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). The court may "inquire into jurisdictional facts" to determine whether it has jurisdiction. Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991). The plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. Brandt v. United States, 710 F.3d 1369, 1373 (Fed. Cir. 2013).

Claims for damages arising out of a contract with the United States are squarely within the express terms of the Tucker Act. 28 U.S.C. § 1491(a). A lease, of course, is a contract. Prudential Ins. Co. v. United States, 801 F.2d 1295, 1296 (1986) ("[T]hough a lease may concern and convey a property interest, it is also very much a contract."). Thus, this Court has subject matter jurisdiction to resolve Count I of plaintiffs' complaint alleging a breach of contract arising

---

[8]See Oil Res. Inc., 28 IBLA at 405 (distinguishing between cancellation and termination of a lease in the federal oil and gas leasing context).

out of BLM's failure to convey a valid leasehold interest to plaintiffs and its cancellation of their oil and gas leases.

Notwithstanding the foregoing, the government has filed a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1). The predicate for the government's motion is apparently that the adjudication of plaintiffs' contract claim would require this Court to review and reverse the IBLA's determination that the lease agreements were void ab initio and were properly canceled. As the government correctly observes, Congress has invested the federal district courts with exclusive jurisdiction to review IBLA decisions pursuant to the Administrative Procedure Act. See Aulston v. United States, 823 F.2d 510, 513 (Fed. Cir. 1987).

As described in greater detail below, the Court agrees with the government's argument that the IBLA's findings in this case are fatal to one aspect of plaintiffs' contract claims, but not another. But, in any event, the government's arguments regarding the binding nature of the IBLA's determinations do not go to this Court's subject matter jurisdiction over plaintiffs' contract claims; they go to the merits of those claims. See Moden v. United States, 404 F.3d 1335, 1340 (Fed. Cir. 2005) ("Subject matter jurisdiction exists when a [plaintiff] asserts a nonfrivolous claim" that falls within this Court's general subject matter jurisdiction); Aulston, 823 F.2d at 513 (quoting Freese v. United States, 221 Ct. Cl. 963, 964-65 (1979)) (observing that court has general jurisdiction over plaintiff's takings claims notwithstanding that it lacks power to overturn Secretary of Interior's conclusion that mining claims were not valid). The government's motion to dismiss plaintiffs' breach of contract claim for lack of subject matter jurisdiction under RCFC 12(b)(1) is, accordingly, denied.

## II. Plaintiffs' Motion for Summary Judgment is Granted As to Its Claim for Breach of Contract Arising Out of the Failure to Convey a Valid Leasehold Interest, But Denied as to Its Claim for Breach of Contract Arising Out of the Cancellation of the Lease.

### A. Legal standards for summary judgment.

Plaintiffs and the government have each moved for summary judgment pursuant to RCFC 56. A moving party is entitled to summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the initial burden of showing that there are no genuine issues of material fact. Celotex Corp., 477 U.S. at 323. The burden then shifts to the nonmoving party to show that there are genuine issues of material fact for trial. Id. at 324. Both parties may carry their burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." RCFC 56(c)(1).

In this case, the material facts with respect to the parties' cross motions for summary judgment are not in dispute.  The issues before the Court, which involve the government's liability for breach of contract, as well as the proper measure of damages, are purely legal ones.  Accordingly, the Court concludes that the issues raised by the parties in their motions are appropriate for disposition by summary judgment, as described below.

**B.  Plaintiffs are entitled to summary judgment on the government's liability for breach of contract arising out of BLM's failure to convey a valid leasehold interest.**

Plaintiffs argue that BLM committed breaches of contract when it (1) failed to convey a valid leasehold interest to them as promised in the lease agreements and (2) canceled the leases before the conclusion of their terms.  For the reasons set forth below, the Court agrees with plaintiffs that the government committed a breach of contract when it failed to convey a valid leasehold interest to plaintiffs but finds that the cancellation of the leases was not a breach of contract.  Therefore, the Court grants in part and denies in part plaintiffs' motion for summary judgment on Count I of its complaint alleging a breach of contract by the government and also grants in part and denies in part the government's cross motion for summary judgment as to Count I.

**1.   The Griffin leases were valid contracts.**

In order to recover for a breach of contract, plaintiffs must show:  (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach.  San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989).  The government's opposition to plaintiffs' motion for summary judgment focuses almost exclusively on contesting the first element of a breach of contract claim—the existence of a valid contract.

The elements of a valid contract are (1) mutuality of intent, (2) consideration, (3) lack of ambiguity in the offer and acceptance, and (4) actual authority to bind the government in contract on the part of the government official whose conduct is relied upon.  Kam-Almaz v. United States, 682 F.3d 1364, 1368 (Fed. Cir. 2012); Suess v. United States, 535 F.3d 1348, 1359 (Fed. Cir. 2008); Flexfab, L.L.C. v. United States, 424 F.3d 1254, 1265 (Fed. Cir. 2005).  In that regard, plaintiffs and the government submitted copies of leases MSES 54127 and MSES 54583 appended to their briefs, evidencing offer, acceptance, consideration, and the signature of an authorized government representative.  See Total Med. Mgmt., Inc. v. United States,  104 F.3d 1314, 1320 (Fed. Cir. 1997) (finding that "the existence of [a] negotiated, signed [Memoranda of Understanding] evidences offer and acceptance").  Indeed, the government does not suggest that there was any ambiguity in the offer and acceptance of the terms in the Griffin leases.  Nor does the government suggest that BLM officials with whom plaintiffs dealt lacked the authority to bind the government in contract.[9]  Instead, the government cites the IBLA's observation that the

---

[9] BLM's error in issuing the leases does not vitiate its officials' authority to bind the government in contract.  See Cooke v. United States, 91 U.S. 389, 398 (1875) (government is liable for the mistakes of its agent if the agent's action is within the scope of his or her authority);  John Cibnic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 64 (4th ed. 2006)

leases were "void ab initio," and argues that this conclusion (which the Court lacks the authority to disturb) means that the lease itself is a "nullity" that cannot impose obligations on the government or serve as the basis for an award of damages. Def.'s Opp'n 17.

The government's argument that the IBLA's decision precludes this Court from finding that the leases were valid contracts is unpersuasive. While the IBLA concluded that the leases were "void ab initio," it is clear that what the IBLA meant in so concluding is that—because of the existence of the Bayou lease—the Griffin leases never conveyed to plaintiffs the valid leasehold interest that they were promised. But, the fact that the leases never effectively conveyed the promised leasehold interests does not affect their validity as contract instruments between the government and plaintiffs, which is dependent upon the existence of the four elements of a valid contract set forth above.

In addition, a finding of fraud or other wrongdoing is a necessary predicate to a finding that the leases were void ab initio for purposes of government contract law. Kellogg Brown & Root Servs., Inc. v. United States, 728 F.3d 1348, 1371 (Fed. Cir. 2013) ("the general rule is that a Government contract tainted by fraud or wrongdoing is void ab initio . . . . A contract without the taint of fraud or wrongdoing, however, does not fall within this rule" (quoting Godley v. United States, 5 F.3d 1473, 1476 (Fed.Cir.1993))); cf. United States v. Amdahl Corp., 786 F.2d 387, 395 (Fed Cir. 1986) (under applicable precedent "the binding stamp of nullity" should only be imposed where the illegality of a contract award is "plain" (quoting John Reiner & Co. v. United States, 325 F.2d 438, 440 (1963))). Thus, the IBLA did not hold, and the government does not argue, that the lease contracts were procured through fraud or other wrongdoing.

Indeed, a conclusion regarding the validity of the lease instrument as a contract would be beyond the IBLA's authority. The IBLA has final authority to apply the Secretary's regulations to determine disputes over property interests in connection with oil and gas leases. See 43 C.F.R. § 4.1 (The Board decides appeals relating to "the use and disposition of public lands and their resources" and "the use and disposition of mineral resources in certain acquired lands of the United States."). As the IBLA itself has recognized, however, where there is no relevant statutory or regulatory provision, it does not have the authority to decide issues of contract law. See Exxon Corp., 95 IBLA 374, 376 (1987).[10]

---

("While it cannot be said that the government authorizes its agents to make mistakes or to commit torts, [the government] is liable for the agent's action if it is within the scope of his or her authority.").

[10] As the IBLA observed:

> The jurisdiction of the Board to review BLM decisions regarding disposition of minerals on Federal public domain or acquired lands under 43 CFR 4.1 is limited to appeals from decisions implementing the relevant statutory and regulatory provisions regarding mineral leasing. There has been no delegation of authority to this Board which would permit us to adjudicate disputes arising under the law of contracts resulting in a claim for damages for breach of a lease contract.

The government's reliance upon a line of cases holding that adverse IBLA determinations can be fatal to a plaintiff's Fifth Amendment takings claim (Def.'s Opp'n 15) is misplaced. Those cases turned on the principles that (1) as noted above, the IBLA has the authority, subject only to APA review, to determine whether a party possesses a valid property interest under the Secretary of the Interior's regulations, and (2) the existence of a valid property interest is an indispensable element of a takings claim.[11]  See Freese, 221 Ct. Cl. at 964-65 (granting summary judgment to government because the court was bound by the Secretary of the Interior's administrative determination that plaintiff's mining lode claims were null and void); Underwood Livestock, Inc., v. United States, 79 Fed. Cl. 486, 497 (2007) (In resolving a takings claim, the Court of Federal Claims "does not have either the jurisdiction to review, or the authority to disregard, IBLA decisions that adjudicate property rights"); Aulston v. United States, 11 Cl. Ct. 58, 61 (1986), vacated in part but aff'd on merits by 823 F.2d 510 (Fed. Cir. 1987) (court cannot disregard the IBLA's decision that plaintiff lacked a valid mining claim); Bayshore Res. Co. v. United States, 2 Cl. Ct. 625, 632 (1983) (case dismissed for failure to state a claim because the Court of Claims has no authority to set aside DOI determinations declaring unpatented mining claims null and void).

By contrast, there is no inconsistency between Griffin's breach of contract claim and the IBLA's decision here.  Thus, fidelity to the IBLA's determination that BLM never conveyed a valid leasehold interest to plaintiffs does not preclude this Court from concluding that the lease itself (in which BLM promised to convey such an interest) was a valid contract for purposes of plaintiffs' contract claim.  Nor does it preclude the Court from ruling that (as described below) BLM breached its obligation under the lease to convey a valid leasehold interest to plaintiffs.  In fact, as described below, the IBLA's ruling on this point, holding that BLM did not convey the valid leasehold interest it promised plaintiffs, actually confirms that such a breach occurred.

### 2.  The government's argument based on mutual mistake of fact is meritless.

In addition to arguing that the contract was invalid because it was "void ab initio," the government argues in the alternative that even if a valid contract exists, "the contract should be determined to be unenforceable due to mistake regarding the availability of the land for leasing." Def.'s Opp'n 20.  This contention is similarly unavailing.

"A mutual mistake is an error for which each party is partly responsible, or, a unilateral mistake which the other party knew or had reason to know of prior to consummation of the contract." Fadeley v. United States, 15 Cl. Ct. 706, 708 (1988).  A party alleging mutual mistake must prove that (1) both parties were mistaken in their belief regarding a fact existing at the time

---

95 IBLA at 376.

[11] See Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001) ("It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation."); Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1212 (Fed. Cir. 2005); Conti v. United States, 291 F.3d 1334, 1339 (Fed. Cir. 2002); M&J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir. 1995).

of contracting, (2) the mistaken belief constituted a basic assumption on which the contract was made, (3) the mistake had a material effect on the bargain, and (4) the contract did not place the risk of mistake on the party seeking relief.  Atlas Corp v. United States, 895 F.2d 745, 750 (Fed. Cir. 1990).

In this case, the "mistake" about the availability of the land for lease was not mutual. The Secretary of the Interior through officials and employees of MMS, a component agency, had knowledge that the prior Bayou lease had not terminated at the time that BLM executed the leases with plaintiffs.  While there were a series of miscommunications and mishaps which led BLM officials not to have actual knowledge of the existence of the prior lease, MMS' actual knowledge may be imputed to BLM because both are agencies within the Department of Interior. Compare J.A. Jones Constr. Co. v. United States, 182 Ct. Cl. 615, 623 (1968) (imputing knowledge of one agency to another where there was an interagency relationship between the two agencies; personnel at one agency knew the relevant facts and its probable consequences at the time the contract was awarded; plaintiff neither knew nor should have known those facts; and the agency was or should have been aware of plaintiff's ignorance), with Bateson-Stolte, Inc. v. United States, 172 F.Supp. 454, 457 (Ct. Cl. 1959) (concluding that a truly independent federal agency should not be charged with knowledge of what another is doing simply because both are components of the same Federal Government).

Further, even assuming that BLM did not have imputed knowledge that the prior Bayou lease had never terminated, a party cannot rely upon a mutual mistake of fact to avoid enforcement of a contract where, as here, the "mistake" is a result of that party's failure to exercise due diligence.  Meek v. United States, 26 Cl. Ct. 1357, 1362 (1992).  "Ignorance is never sufficient to constitute a ground of relief if it appears that the requisite knowledge might have been obtained by reasonable diligence.  He who averts knowledge to himself cannot later claim lack of knowledge."  Collins v. United States, 532 F.2d 1344, 1348 (Ct. Cl. 1976). Accordingly, the government's invocation of "mutual mistake" as grounds for invalidating the leases is unavailing.

### 3.  BLM breached the contract when it failed to convey a valid leasehold interest to plaintiffs.

The issue of whether the government breached its obligations under the Griffin leases is a matter of contract interpretation.  "Contract interpretation begins with the plain language of the agreement."  Gould Inc. v. United States, 935 F.2d 1271, 1274 (1991).  The Court gives the language of the agreement "the meaning that would be derived from the contract by a 'reasonably intelligent person acquainted with the contemporaneous circumstances.'"  Allied Tech. Grp., Inc. v. United States, 39 Fed. Cl. 125, 138 (1997) (quoting Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 975 (Ct. Cl. 1965)).  That is, the Court gives the contract terms their "plain and ordinary meaning."  Keeter Trading Co. v. United States, 79 Fed. Cl. 243, 256 (2007) (citing Aleman Food Servs., Inc. v. United States, 994 F.2d 819, 822 (Fed. Cir. 1993)).

The granting clause of the Griffin leases here states that "[t]his lease is issued granting the exclusive right to drill for, mine, extract, remove and dispose of all the oil and gas (except helium) in the lands described . . . together with the right to build and maintain necessary improvements thereupon for the term indicated below, subject to renewal or extension in

accordance with the appropriate leasing authority."  Pl. Mot. Summ. J. Exs. A, B.  "Exclusive" means excluding or having the power to exclude or limiting or limited to possession, control, or use as by a single individual or group.  Webster's Third New International Dictionary (3d ed. 1993).  Thus, in signing the leases with plaintiffs, BLM obligated itself to provide plaintiffs with the sole right to drill for, mine, and extract the oil and gas on the identified property for the term of the lease.  Implicit in that obligation is a promise to grant plaintiffs a leasehold interest that is valid and not subject to the competing claims of another lessee.

Relevant principles of landlord-tenant law are highly instructive here.  See Prudential Ins., 801 F.2d at 1298 (confirming the usefulness of established principles of landlord-tenant law in construing leases in which the federal government is a party); Keydata Corp. v. United States, 504 F.2d 1115, 1123-24 (Ct. Cl. 1974).  In that regard, "[i]t is well settled that on signing a lease the landlord warrants that he has sufficient title to lease all of the property for the term."  Restatement (Second) of Prop.: Landlord and Tenant § 4.2 reporter's note (1977); see also Stott v. Rutherford, 92 U.S. 107, 109 (1875) ("The words 'grant' and 'demise' in a lease for years create an implied warranty of title and a covenant for quiet enjoyment.").  Thus, "[e]xcept to the extent the parties to a lease validly agree otherwise, there is a breach of the landlord's obligations if, on the date the tenant is entitled to possession, there is a paramount title the assertion of which would deprive the tenant of the use contemplated by the parties."  Restatement (Second) of Prop.: Landlord and Tenant § 4.2.

As described above, lease MSES 54127 was issued on July 14, 2006 to take effect on August 1, 2006.  Pl.'s Mot. Summ. J. Ex. A.  Lease MSES 54583 was issued on February 28, 2007 and effective on March 1, 2007.  Id. Ex. B.  By virtue of the express terms of the contracts, as well as the implied warranty of title, the government was obligated to convey a valid leasehold interest to plaintiffs on the effective date of the leases.  The government failed to fulfill its contractual promise and violated the warranty because at the time the Griffin leases were to take effect, the Bayou lease was still in effect.  Therefore, as the IBLA found, no valid leasehold interest was conveyed.  In short, BLM violated the granting clause of the lease and the warranty of title implicit in the lease agreement by failing to convey a valid leasehold interest to plaintiffs.  Plaintiffs are entitled to damages to compensate them for injuries resulting from that breach.

### 4.   The cancellation of the Griffin leases was not a breach of the contracts.

As discussed above, the Court concludes that BLM breached its obligation under the Griffin leases to convey a valid leasehold interest to plaintiffs.  But contrary to plaintiffs' contentions, the subsequent cancellation of the leases was not a breach of the contract.  The parties agreed that the "[r]ights granted [in the lease] are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to regulations and formal orders hereafter promulgated when not inconsistent with lease rights granted or specific provisions of this lease."  Pl.'s Mot. Summ. J. Exs. A, B.  One of the regulations incorporated into the terms of the leases by this clause is 43 C.F.R. § 3108.3(d) which states that "[l]eases shall be subject to cancellation if improperly issued."  This regulatory right of cancellation was designed to provide the Secretary of the Interior with flexibility in managing public lands and with the ability to correct the mistakes of his subordinates.  See Boesche v. Udall, 373 U.S. 472, 478-79 (1963) (The Secretary of the Interior has the authority to cancel any oil and gas lease issued in violation of the

Mineral Leasing Act and implementing regulations or for administrative errors committed prior to the issuance of the lease).

In this case, BLM determined and the IBLA agreed that the leases were improperly issued because the Bayou lease had never terminated.  Plaintiffs did not seek review of the Board's decision in district court.  This Court is bound by BLM's conclusion that the Griffin leases were improperly issued and necessarily canceled.  Accordingly, the cancellation of the leases was consistent with their provisions and cannot serve as the basis for a claim for breach of contract.

## III. The Government is Not Entitled to Summary Judgment on the Proper Measure of Damages.

The government has moved for summary judgment on the proper measure of damages in this case.  The government argues that plaintiffs are entitled, at most, to recover on a quasi-contractual theory that would limit their remedy to restitution.  The government's argument on this point, however, rests on the premise that the lease agreements were not valid contracts and hence cannot be the basis for a claim for contractual damages.  As set forth above, the Court rejects the government's contention and holds that the leases were valid contracts which the government breached by failing to convey valid leasehold interests to plaintiffs.  Accordingly, plaintiffs are not necessarily limited to a restitution remedy but are free to present any other alternative to the Court as the appropriate measure of damages.

While it would be premature at this time to make any firm pronouncements regarding damages, the Court notes that there are certain established principles and considerations that will be taken into account in determining any award of damages in this matter.  Contract law recognizes that in a breach of contract case a promisee has three enforceable interests: expectation, reliance, and restitution.  Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1308 (Fed. Cir. 2004) (citing Restatement (Second) of Contracts § 344).

Generally, in case of a breach of contract, the injured party has a right to expectation damages.  See San Carlos Irrigation & Drainage Dist., 111 F.3d at1562-63.  "Expectation interests" encompass the plaintiff's interests in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed.  Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1379 (Fed. Cir. 2001) (citing Restatement (Second) of Contracts § 344(a)).  "An award of lost profits is one way of compensating the promisee's, or the non-breaching party's, expectation interest."  Hansen Bancorp, Inc., 367 F.3d at 1308 (citing Energy Capital Corp. v. United States, 302 F.3d 1314, 1324 (Fed. Cir. 2002)).  To recover lost profits, the plaintiff must establish by a preponderance of the evidence that (1) the lost profits were reasonably foreseeable or actually foreseen by the breaching party at the time of contracting, (2) the lost profits were caused by the breach, and (3) the amount of the lost profits has been established with reasonable certainty.  Cal. Fed. Bank v. United States, 395 F.3d 1263, 1267 (Fed. Cir. 2005); see also Restatement (Second) Contracts § 352 ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.").

Alternatively, if plaintiffs cannot establish their expectation damages with reasonable certainty, plaintiffs may calculate their damages based on their reliance interest.  See Am. Capital Corp. v. FDIC, 472 F.3d 859, 869 (Fed. Cir. 2006); see also Restatement (Second) of Contracts § 349 ("As an alternative to the measure of damages stated in § 347, the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed."). The reliance interest is the plaintiff's interest "in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made."  Restatement (Second) of Contracts § 344(b).  "As reliance damages, the non-breaching party 'may recover expenses of preparation of part performance, as well as other foreseeable expenses incurred in reliance upon the contract.'"  Hansen Bancorp, Inc., 367 F.3d at 1308 (quoting John D. Calamari & Joseph M. Perillo, The Law of Contracts § 14.9 (4th ed. 1998)).  Like expectation damages, "[i]n order to recover reliance damages, the 'plaintiff's loss must have been foreseeable to the party in breach at the time of contract formation.'"  Am. Capital Corp.  472 F.3d at 867 (quoting Landmark Land Co. v. FDIC, 256 F.3d 1365, 1378 (Fed. Cir. 2001).

Finally, the non-breaching party's "restitution interest" is his interest "in having restored to him any benefit that he has conferred on the other party" by way of part performance or reliance on the contract.  Hansen Bancorp, Inc., 367 F.3d at 1316 (quoting Restatement (Second) of Contracts § 344 (c)).  "Restitution has been characterized as 'a fall-back position' for the injured party who is unable to prove expectancy damages."  Hansen Bancorp, Inc., 367 F.3d at 1309 (quoting Glendale Fed. Bank., 239 F.3d at 1380 (Fed. Cir. 2001).  The idea behind restitution is to restore—that is, to restore the non-breaching party to the position he would have been in had there never been a contract to breach."  Glendale, 239 F.3d at 1380.  In other words, "[t]he objective is to return the parties, as nearly as practicable, to the situation in which they found themselves before they made the contract."  Hansen Bancorp, Inc. v. U.S., 367 F.3d at 1308 (quoting Restatement (Second) of Contracts § 1384 cmt. a.).  Restitution may be measured by "either (a) the reasonable value to the other party of what he received in terms of what it would have cost him to obtain it from a person in the claimant's position, or (b) the extent to which the other party's property has been increased in value or his interests advanced."  Hansen Bancorp, Inc., 367 F.3d at 1314 (quoting Restatement (Second) of Contracts § 371).  The non-breaching party is commonly allowed the more generous measure of damages, unless that measure is unduly difficult to apply.  Hansen, 367 F.3d at 1316 (quoting Restatement (Second) Contracts § 371 cmt. a.)

In this case, of course, any request for damages for injury to plaintiffs' interests must take into consideration the Court's holding that the cancellation of the leases was not, in and of itself, a breach and the IBLA's binding ruling that, in fact, the cancellation of the leases was required by law.  The cancellation clause in the leases is similar in some respects to the "termination for convenience" clauses that are included in government contracts for the procurement of goods and services.  As in that analogous context, it may be inappropriate to provide an award of damages based on interference with plaintiffs' expectation interest, for which the legitimate cancellation of the lease would be the intervening cause.  See Cal Fed. Bank, 245 F.3d at 1349 ("Lost profits are 'a recognized measure of damages where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely

established, and there is some basis on which a reasonable estimate of the amount of the profit can be made.'" (quoting <u>Neely v. United States</u>, 152 Ct. Cl. 137, 285 F.2d 438, 443 (1961))). The Federal Acquisition Regulation provides for a form of reliance damages to contractors when the government exercises its right to terminate for convenience.  <u>Krygoski Constr. Co. v. United States</u>, 94 F.3d 1537, 1545 (Termination for convenience damages include "costs of performance prior to termination, profits on that performance and termination costs.  No anticipatory profits are to be awarded."); <u>cf.</u> FAR 52.249-2.  The Court will need the parties' assistance in determining whether, by analogy, reliance damages are the most appropriate measure of damages in this case as well.

In addition, principles of landlord-tenant law may also be instructive in determining the proper measure of damages in this case.  The Restatement (Second) of Property: Landlord and Tenant §§ 4.1, 4.2, 4.3 and 10.2 address the potential measure of damages available in circumstances where a tenant is evicted from the property by a third party that possesses paramount title.  It provides, among other things, that the tenant may be entitled to foreseeable losses incurred due to reasonable expenditures made by the tenant before the default, anticipated business profits, and interests on any amount recovered.  <u>Id.</u> § 10.2.  Again, the Court seeks the assistance of the parties to determine the extent to which these principles might apply to this case.

At this point in the proceedings, the damages issues have not been fully briefed, and it is unclear whether and to what extent there will be factual disputes to resolve with respect to any award of damages.  Therefore, the Court will give the parties an opportunity to review this ruling and propose a way forward on the issue of damages within 30 days of the issuance of this Order.

## CONCLUSION

On the basis of the foregoing:

(1)  The government's motion to dismiss under RCFC 12(b)(1) is **DENIED**.

(2)  Plaintiffs' motion for summary judgment as to liability for breach of contract is **GRANTED in part** and **DENIED in part**.

(3)  The government's cross motion for summary judgment as to liability for breach of contract is **GRANTED in part** and **DENIED in part**.

(4) The government's motion for partial summary judgment regarding the proper measure of damages is **DENIED**.

The parties shall file a joint proposal (or if necessary separate proposals) to govern future proceedings in this case within 30 days of this Order, after which the Court will schedule a status conference.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge